IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NEAL JOHN TIBBS,

             Petitioner,                  No. CIV S-05-2334 LKK KJM P

    vs.

D. ADAMS, Warden,               <u>ORDER AND</u>

             Respondent.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I . <u>Procedural Background</u>

       On September 16, 1999, petitioner was convicted in San Joaquin County of a number of violations of California Penal Code §§ 288(a), 261.5, 289(a) and 289(h).  CT 325-327.[1]

       On January 13, 2000, the court denied the motion for a new trial and sentenced petitioner to a total term of twenty-five years.  CT 681-682; RT 1213.  He filed a timely notice of appeal on January 18, 2000 and on February 28, 2000, the Court of Appeal appointed Attorney Eric Weaver to represent him.  <u>See</u> Docket, <u>People v. Tibbs</u>, Case No. C034726 (Cal. 3rd Ct.

---

[1]  "RT" refers to the Reporter's Transcript and "CT" to the Clerk's Transcript of the proceedings in San Joaquin County Superior Court.

1   App.);[2] Resp't's Lodg. Doc. (Order Appointing Counsel).[3]  However on April 28, 2000, retained

2   counsel George Robertson was substituted in as counsel of record.  Docket, <u>People v. Tibbs</u>,

3   Case No. C034726 (Cal. 3rd Ct. App.); Resp't's Lodg. Doc. (Substitution & Order).

4           The Court of Appeal affirmed petitioner's convictions in an opinion filed June 14,

5   2001.  Motion to Dismiss (Docket Nos. 8-1 & 8-2) (MTD) at E1-9; Lodg. Doc. (Court of Appeal

6   Opinion).  Through counsel, petitioner filed a petition for review in the California Supreme

7   Court; this was denied on September 26, 2001.  MTD at E10-11; Resp't's Lodg. Doc. (Petition

8   for Review).

9           On May 8, 2003, Robertson filed a petition for a writ of habeas corpus in the

10  Court of Appeal; it was denied the same day with a citation to <u>In re Hillery</u>, 202 Cal.App.2d 293

11  (1962) (declining jurisdiction in favor of the superior court).  Docket, <u>In re Neal John Tibbs</u> on

12  Habeas Corpus, Petition No. C043949 (Cal. 3rd Ct. App.);[4] MTD at E13-14.

13          On May 20, 2003, Robertson filed a habeas petition in San Joaquin County

14  Superior Court.  Resp't's Lodg. Doc. (Writ Petition).  This was denied on June 30, 2003.  MTD

15  at E17-21; Resp't's Lodg. Doc. (Order).  Robertson returned to the Court of Appeal on

16  September 17, 2003.  After soliciting an informal response from the People, the Court of Appeal

17  denied that petition on January 29, 2004.  MTD at E23-25; Resp't's Lodg. Doc. (Orders).

18          On May 24, 2004, petitioner filed a habeas petition in the California Supreme

19  Court in propria persona.  MTD E27-29.  This was denied on July 13, 2005.  <u>Id</u>.

20          The instant petition was filed November 18, 2005.

21  /////

22

23      [2]  The court was able to access this docket at the time this order was signed through the
    website maintained by California Third District Court of Appeal.

24

25      [3]  Respondent's lodged documents are not identified on their cover pages by numbers;
    therefore the court refers to them by summary descriptors.

26      [4]  <u>See</u> note 2 <u>supra</u>.

1    On June 28, 2006, respondent filed a motion to dismiss, arguing that this action

2    was filed outside the statute of limitations.  In his opposition, petitioner argued that he relied on

3    Attorney Robertson to act in a timely fashion; that Robertson continually assured petitioner and

4    his family that there were no deadlines; that Robertson did not send petitioner his transcripts,

5    which would have enabled petitioner to pursue habeas relief on his own.  Opposition (Opp'n)

6    (Docket No. 11) at 3-8.  In reply, respondent offered the 2003 declaration petitioner had filed in

7    support of his superior court writ, in which he averrred he instructed his attorney not to send him

8    copies of any of the records in the case because of the danger from other inmates should they

9    learn of the nature of his charges.  Reply (Docket No. 12-2) at 11 ¶ 16.  Petitioner submitted a

10   surreply, averring he had not had time to read the declaration, which Robertson had presented for

11   his signature just as visiting hours were ending.  He conceded, however, that his life would have

12   been in danger had he been in possession of his legal papers before his transfer to the "Sensitive

13   Needs Yard" in April 2002.  Surreply (Docket No. 13) at 3-4, ¶¶ 2, 3.  Petitioner asserts he asked

14   for his records after his transfer, but that Robertson refused to comply and told petitioner, his

15   wife and his sister there was nothing to be concerned about.  Id. ¶ 4.

16   II.  The Statute Of Limitation And Tolling Principles

17   One of the changes the Antiterrorism and Effective Death Penalty Act (AEDPA)

18   made to the habeas statutes was to add a statute of limitations for filing a habeas petition:

19   (d)(1) A 1-year period of limitation shall apply to an application for
     a writ of habeas corpus by a person in custody pursuant to the
20   judgment of a State court. The limitation period shall run from the
     latest of–
21
     (A) the date on which the judgment became final by the conclusion
22   of direct review or the expiration of the time for seeking such
     review;
23
     (B) the date on which the impediment to filing an application
24   created by State action in violation of the Constitution or laws of
     the United States is removed, if the applicant was prevented from
25   filing by such State action;

26   /////

1    (C) the date on which the constitutional right asserted was initially
2    recognized by the Supreme Court, if the right has been newly
     recognized by the Supreme Court and made retroactively
3    applicable to cases on collateral review; or

4    (D) the date on which the factual predicate of the claim or claims
     presented could have been discovered through the exercise of due
5    diligence.

6    (2) The time during which a properly filed application for State
     post- conviction or other collateral review with respect to the
7    pertinent judgment or claim is pending shall not be counted toward
     any period of limitation under this subsection.

8    28 U.S.C. § 2244.

9          A conviction is final for purposes of the AEDPA statute of limitations at the

10   expiration of the ninety day period for seeking certiorari, Bowen v. Roe, 188 F.3d 1157, 1159

11   (9th Cir. 1999)

12         The statute of limitations is tolled during the pendency of any "properly filed"

13   state collateral attack on the judgment.  Nino v. Galaza, 183 F.3d 1003, 1006-07 (9th Cir. 1999).

14   However, a state petition filed after the limitations period has run will neither revive nor toll the

15   statute of limitations.  Jimenez v. Rice, 276 F.3d 478, 481 (9th Cir. 2001).

16         The parties do not dispute the fact that the AEDPA statute of limitations expired

17   on December 27, 2002, and was not revived by the habeas petitions Robertson filed in 2003.

18   Appointed counsel for petitioner argues, however, that petitioner is entitled to equitable tolling

19   because of petitioner's low intellectual functioning and passivity and because of Robertson's

20   malfeasance.  It is petitioner's burden to show he is entitled to equitable tolling.  Espinoza-

21   Matthews v. People of the State of California, 432 F.3d 1021, 1026 (9th Cir. 2005).  To meet this

22   burden, he must demonstrate "(1) that he has been pursuing his rights diligently, and (2) that

23   some extraordinary circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S. 408, 418

24   (2005). Equitable tolling is justified in few cases, and "the threshold necessary to trigger

25   equitable tolling under the AEDPA is very high, lest the exceptions swallow the rule."  Spitsyn v.

26   Moore, 345 F.3d 796, 799 (9th Cir. 2003) (internal citation, quotation omitted).  Phrased another

4

way, a habeas petitioner may be entitled to equitable tolling if circumstances beyond his control make it impossible for him to file his petition on time.  Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999).

III.  Equitable Tolling

A.  Mental State

Psychologist Laura Geiger, Ph.D., met with petitioner on September 26, 2007 and evaluated him by administering a number of psychological tests, reviewing his school records and his medical records from California Department of Corrections and Rehabilitation (CDCR), taking a history from him, and generally observing him as he answered questions and completed the tests.  EH[5] 7.  She explained that the results of the tests would not be confidential, which he appeared to understand after she reviewed it with him three times, modifying the language of her explanation for clarity.  EH 32.

In Dr. Geiger's opinion, petitioner would have difficulty preparing and filing a timely habeas petition:

> [I]t would be extremely difficult, if not impossible for someone who is–you think of a typical seventh grader, which is the level, the highest level I believe he's functioning with regard to reading. . ., I don't see him being able to do that.  It's a very low probability he would be able to complete that.

EH 26.  On cross-examination, she elaborated that petitioner would

> have a hard time, an extremely difficult time, collecting himself, organizing himself, and understanding the procedures that he would sequentially have to follow in order to complete that sort of complex. . . task.

EH 64.  She conceded, "I'm not saying he couldn't do it," but observed that "he doesn't have . . . the intellectual capability and achievement level of functioning to be able to do one, and in a way that would be the best representation of himself."  EH 67-68.

---

[5] "EH" refers to the transcript of the evidentiary hearing held April 14, 2008.

1    She found support for these conclusions in the results of tests, her review of the
2 record, and her personal observations.  One battery of tests showed petitioner to be reading
3 between the fifth and seventh grade level and spelling at the fifth grade level; from this Dr.
4 Geiger opined that petitioner "functions in a low average fashion with regard to his reading
5 ability and level of verbal comprehension" and has basic difficulties in understanding
6 information conveyed orally and in writing.  EH 8-9, 38.  Dr. Geiger also opined that petitioner
7 would not be able to read and comprehend complex documents without assistance and would be
8 able to prepare written product only at a fifth grade level.  EH 27.

9    Dr. Geiger's conclusions about petitioner's ability to comprehend were buttressed
10 by two things.  First, Dr. Geiger later reviewed petitioner's school records from kindergarten
11 through eighth grade; these showed he had been held back in the first grade and he had well
12 below average scores on standardized tests administered in school.  EH 13-14, 31.  These data
13 were consonant with the results of the IQ tests she administered, which showed that petitioner's
14 verbal comprehension was at the 18th percentile, although his non-verbal performance on the
15 tests was significantly higher.  EH 10-11.  The wide gap and petitioner's tremors suggested brain
16 damage. EH 12-13.

17    Petitioner told Dr. Geiger he had been diagnosed as having had some mini-
18 strokes.  EH 21.  Dr. Geiger believed the report to be valid because of petitioner's tremors, but
19 conceded the medical records she had been provided did not include any diagnosis or other report
20 of such episodes.  EH 21, 32, 55.  Petitioner also reported some blows to the head, including one
21 involving a loss of consciousness.  EH 21-22.  Once again, even though this was not described in
22 the medical records, Dr. Geiger's observations of petitioner and "how he responded on some of
23 the testing," supported the notion that there had been some sort of head trauma.  EH 34, 73.  As a
24 result, Dr. Geiger recommended, but did not perform, further neuropsychological evaluation.  EH
25 22.  Nevertheless, the general screening test for neuropsychological dysfunction showed
26 petitioner's "gross organic functioning is intact."  EH 13.

1    The medical records Dr. Geiger did receive showed that petitioner had been

2 diagnosed with a major depressive disorder, which could have affected his ability to concentrate.

3 EH 15.  She believed petitioner was "mildly depressed and anxious" when she evaluated him.

4 EH 16.

5    In addition, petitioner's score on the Personality Assessment Inventory suggested

6 "this is not going to be a person taking the initiative to get things done" and who would

7 subordinate his needs to others.  EH 23-24.  He would be "more likely than not to hold his

8 tongue."  EH 50.[6]

9    Dr. Geiger acknowledged that petitioner got his GED in 2003 while in prison; she

10 could not explain how that meshed with her findings.  EH 8-9.  Petitioner explained that Mr.

11 Johnson, a teacher in the prison, worked with petitioner on pre-GED tests, which petitioner took

12 three times.  ER 192-193.  After that, Mr. Johnson felt petitioner was ready for the test, which he

13 passed on his first attempt.  EH 193.  In addition, petitioner learned to use a dictionary once he

14 started working in the library at Corcoran.  EH 191-192.  He can read the writ prepared on his

15 behalf and understands a lot of the words.  EH 191.

16 /////

17

18    [6] Dr. Geiger did not know that petitioner had talked to the police, had testified at trial and
had spoken up during sentencing; she acknowledged that these interactions could show
19 petitioner's ability to  manage oral input.  EH 51-52.  One of the exhibits respondent used on
cross-examination of Dr. Geiger, Exhibit D, is a portion of the transcript of the motion for a new
20 trial and sentencing.   At that hearing, petitioner inserted himself into the conversation between
court and counsel regarding petitioner's representation:
21
            Well, you know, I wanted Brian to represent me whether you guys
22            came together.  Here we came up last – last time we came here you
            said, "We came up with 25 years."  Who is "we"?  You and the
23            DA.  My attorney wasn't even present for this stuff.  You know,
            I've never had a chance to say anything, Your Honor.  I asked to
24            talk–

25 RT 1184; Resp't's Ex. D at 76.  His interjections continued throughout the hearing.  RT 1184-

26 1187.

As part of his post-hearing briefing, respondent has raised a <u>Daubert</u>[7] challenge to Dr. Geiger's testimony.  In his post-hearing briefing, petitioner has objected to respondent's Exhibits A and M, excerpts from and the videotape of petitioner's interview with police; respondent offered these exhibits in rebuttal to Dr. Geiger's testimony.  In his reply, petitioner challenges respondent's reliance on petitioner's CDCR medical records that he received from Dr. Geiger.

The court declines to reach these objections, for it finds that even accepting all of Dr. Geiger's testimony and without considering petitioner's interactions with the police, petitioner's mental state does not provide a basis for equitable tolling, as explained below.

Although the Supreme Court has not reached the issue, the Ninth Circuit has held that mental incompetency may equitably toll the limitations period applicable to § 2254 actions because mental incompetency is an extraordinary circumstance beyond a prisoner's control. <u>Lawrence v. Florida</u>, 549 U.S. 327, 337 (2007) ("even assuming this argument could be legally credited, Lawrence has made no showing of mental incapacity"); <u>Laws v. Lamarque</u>, 351 F.3d 919, 923 (9th Cir. 2003).  In determining whether mental incompetency exists, the court engages in a "highly fact dependent" evaluation of the record.  <u>Id.</u> at 922 (citing <u>Whalem/Hunt v. Early</u>, 233 F.3d 1146, 1148 (9th Cir. 2000)).  In order for mental incompetence to serve as a basis for tolling of the limitations period it must have been the actual cause of the untimeliness of the habeas petition.  <u>Allen v. Lewis</u>, 255 F.3d 798, 800 (9th Cir. 2001) ("extraordinary circumstances" must be the "but for and proximate cause of [ ] untimeliness"); <u>see also</u> <u>Gaston v. Palmer</u>, 417 F.3d 1030, 1034 (9th Cir. 2005), <u>as amended</u>, 447 F.3d 1165 (9th Cir. 2006) (analyzing whether causal connection between mental deficiencies and late filing existed in light of specific facts of case).  It is petitioner's burden to show equitable tolling is available.  <u>Gaston</u>, 417 F.3d at 1034.

---

[7] <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).

1        Neither the Supreme Court nor the Ninth Circuit have defined what level of

2  "mental incapacity" or "mental incompetency" will demonstrate a petitioner's entitlement to

3  equitable tolling.  Some courts that have addressed the issue rely less on a definition of mental

4  incompetence and more on the showing of a connection between a mental state and the failure to

5  file.  Thus, some courts have defined the standard as "an inability to pursue one's legal rights,

6  provided there is a nexus between the petitioner's mental condition and her inability to file a

7  timely petition."  United States v. Harris, 268 F.Supp.2d 500, 506 (E.D. Penn. 2003); see also

8  Rhodes v. Senkowski, 82 F.Supp.2d 160, 170 (S.D.N.Y. 2000) (petitioner "must show that these

9  medical problems rendered him unable to pursue his legal rights during the relevant time

10 period").  Another court has noted that "the alleged mental incompetence must somehow have

11 affected the petitioner's ability to file a habeas petition."  Nara v. Frank, 264 F.3d 310, 320 (3d

12 Cir. 2001), overruled in part on other grounds by Carey v. Saffold, 536 U.S. 214 (2002).  Another

13 decision has recognized there is no "bright line rule in determining whether equitable tolling

14 should apply in cases of mental illness, but . . . generally . . . a petitioner must demonstrate some

15 form of incapacitation due to the mental illness that affected his ability to act with due diligence

16 during the time period in question."  Victorial v. Burge, 477 F.Supp.2d 652, 655 (S.D.N.Y.

17 2007).

18       Respondent argues that the term mental incompetency as used in Laws

19 corresponds to the standard for mental competence to stand trial, and cites Lawless v. Evans, 545

20 F.Supp.2d 1044 (C.D. Cal. 2008) in support of his claim.  Resp't's Merits Brief (Docket No. 69)

21 at 19-21.  In Lawless, the petitioner contended that his developmental disability and "mental

22 incompetence" prevented him from timely filing.  545 F.Supp.2d at 1048.  The court did rely in

23 part on the fact that the petitioner had been found competent to stand trial, but also examined

24 petitioner's mental health records from CDCR and found that "petitioner's mental condition has

25 responded well to treatment . . . and has been mostly stable."  Id. at 1049.  Moreover, in Laws

26 itself, the Ninth Circuit relied in part on records showing the petitioner in that case had been

1  found incompetent to stand trial when it remanded the case for further development of the record

2  on the issue.  <u>Laws</u>, 315 F.3d at 923.

3      Another court has listed several factors that might inform the inquiry into the

4  relationship between a petitioner's mental status and the ability to pursue legal remedies:

5          (1) was the petitioner adjudicated incompetent and, if so, when did
           the adjudication occur in relation to the habeas statutory period;
6          (2) was the petitioner institutionalized for his mental impairment;
           (3) has the petitioner handled or assisted in other legal matters
7          which required action during the federal limitations period; and
           (4) has the petitioner supported his allegations of impairment with
8          extrinsic evidence such as evaluations and/or medications.

9  <u>McCray v. Oxley</u>, 553 F.Supp.2d 368, 372 (D. Del. 2008).

10      From these authorities, this court concludes there is no bright line test that must be

11  applied in this case.  It rejects respondent's argument that the <u>Laws</u> court's use of the term

12  "mental incompetence" equates solely to the standard used for determining competence to stand

13  trial.  Rather, as <u>Laws</u> instructs, this court must examine the facts of this case to determine

14  whether petitioner's mental status made it impossible for him to file his federal habeas petition in

15  a timely fashion.  <u>Laws</u>, 351 F.3d at 922-23.

16      Although not determinative, it is significant that Dr. Geiger did not diagnose

17  petitioner with a mental illness: indeed, her diagnosis was adjustment disorder with an anxious

18  and depressed mood.  EH 45.  Moreover, petitioner's hospitalization for depression was brief and

19  occurred soon after petitioner was committed to CDCR, in April 2000.  Resp't's Ex. Re Order

20  Show Cause (Docket No. 66) at 21-23.[8]  That petitioner was mildly depressed when Dr. Geiger

21  evaluated him does not suggest he was unable to protect his legal rights.  <u>Harris</u>, 268 F.Supp.2d

22  at 507 ("depression, even if severe, is a 'normal incident of prison life' that does not excuse an

23  untimely filing").

24  _____

25      [8] Although petitioner has objected to respondent's reliance on many of these documents,
    the court notes that petitioner's own expert relied on his hospitalization in arriving at her
26  conclusion.  EH 15-16.  Accordingly, the court looks to this portion of the records to determine
    the date of the hospitalization.

Dr. Geiger's conclusion was based less on mental illness or any diagnosable condition and more on her evaluation that petitioner was operating at a fifth to seventh grade level of comprehension, perhaps as the result of earlier brain trauma or mini-strokes or some other combination of circumstances, which made it difficult, "if not impossible" for him to handle the steps necessary to pursue his legal rights. This conclusion is insufficient to meet petitioner's burden for several reasons.

First, courts have recognized that a low educational level, even to the point of illiteracy, does not automatically entitle an inmate to equitable tolling. Cobas v. Burgess, 306 F.3d 441, 444 (6th Cir. 2002) (inability to understand English not necessarily a basis for equitable tolling); Turner v. Johnson, 177 F.3d 390, 392 (5th Cir. 1999) (unfamiliarity with the law due to illiteracy not sufficient); Adkins v. Warden, 585 F.Supp.2d 286, 298-99 (D. Conn. 2008) (educational deficits). Second, Dr. Geiger's opinion does not take into account petitioner's real-world achievements despite his comprehension difficulties. As she acknowledged, petitioner was able to understand her advisement that the evaluation was not confidential after she had explained it three times and modified her language. EH 32. In addition, petitioner testified that he prepared for the GED by taking three practice tests and studying for the examination. EH 192-193. Moreover, petitioner learned to use a dictionary while working as a clerk in the library. EH 191. Nothing in the record suggests that petitioner's intellectual or educational deficits would have prevented him from learning how to protect his rights, just as he learned to understand an advisement to master the GED and to use a dictionary. Indeed, these accomplishments show that his mental state did not make it impossible for him to file a timely petition.

B.  Robertson

In December 1999, petitioner's wife Cheryl and sister Laura[9] hired George

---

[9]  Because petitioner's wife and sister share the surname "Tibbs," the court will refer to them by their first names to avoid confusion.

1  Robertson to file a motion for a new trial, pursue an appeal and file a petition for a writ of habeas

2  corpus. EH 99, 101, 103, 104, 140.  Cheryl and Laura "didn't know there was difference of

3  appeals or anything at the time," but when they brought Robertson the money, he explained there

4  were "three levels of appeals; that the writs of habeas corpus was something different . . . to bring

5  in new evidence that wasn't brought up at trial."  EH 148-149.  They retained him to prepare

6  writs of habeas corpus as well:

7              It was a habeas corpus that was supposed to be filed
             simultaneously with the appeal is what he said he was going to do.
8              But I wasn't aware at the time yet of all that at the time.

9  EH 150 (testimony of Laura Tibbs).  Cheryl testified that Robertson was retained to file a federal

10  habeas petition as well as the state filings; Laura described Robertson's agreement to include

11  "anything that we needed to go for, as far as it took," which included taking the case to the

12  "United States Supreme Court if necessary" and that Robertson agreed to "take it to the end; as

13  far as we need to go."  EH 150, 165, 172 (Laura Tibbs); <u>see also</u> EH 104 (Cheryl Tibbs).  Laura

14  believed "everything" included a federal writ of habeas corpus, "to the end; as far as we need to

15  go."  EH 172-173; <u>see also</u> Opp'n (Docket No. 11), Decl. of Cheryl Tibbs ¶ 2 (describing the

16  agreement with Robertson, in part: "if the direct appeal was not successful, he would then

17  prepare post conviction habeas corpus petitions to file with the state and/or federal courts

18  challenging the conviction."); <u>Id.</u>, Decl. of Laura Tibbs ¶ 2 (describing the agreement with

19  Robertson, in part as "if said appeal was denied, to prepare any writ of habeas corpus petition(s)

20  necessary for post conviction review in the state and/or federal court.").

21              Petitioner has not offered a retainer agreement, letters, bills or other documents

22  showing the exact nature of the services Robertson contracted to provide, apart from a retainer

23  agreement for the motion for a new trial and two billing statements from 2000, all of which were

24  attached as exhibits to his opposition to the instant motion to dismiss.  The retainer agreement,

25  dated December 21, 1999, lists the services to be provided as "motion for new trial and, if

26  necessary, sentencing " for a fee of $4000.  Opp'n, Attorney Client Fee Agreement, Rate

Schedule.  Two bills suggest that another agreement was reached in April 2000, for they contain a notation "secured note for services" in the amount of $7000 and then an entry of $700, described as "credit towards appeal."  Id., Statements dated May 1, 2000 and June 3, 2000.

Shortly after retaining Robertson, Cheryl and Laura started calling him on a weekly basis to check on the progress of petitioner's case and asked about any time limits in the case.  EH 103, 151.  Robertson said there were time limits for the appeal, but that the habeas writ "could be brought any time."  EH 166.

In July and again in November 2002, and on other occasions as well, Robertson assured them there was no time limit or that the time limit would be waived and that everything was OK.  EH 104, 105, 124; Opp'n, Decl. of Cheryl Tibbs ¶ 6.  Robertson told Cheryl and Laura that "he just needs to file it in a timely manner" and "as long as he sent something to the Court stating that my husband was too far away that he couldn't go see him and talk to him, that it was okay."  EH 116; see also EH 153, 165.  Often, however, the secretary would tell Cheryl that Robertson was not available, leading Cheryl to believe he was avoiding her.  EH 105.  Sometimes he seemed upset that Cheryl and Laura were bothering him so much.  EH 169.

At hearing, counsel for respondent asked Laura:

Q: Do you know if he said that there were no limits for writs in any court, or did he say a state court or federal court?

A: Can I tell you what he explained to me?  Was –

Q: Please.

A: Okay.  We have the state level and then we have the federal level, and then we have the Supreme or Superior.  Whatever you call it.  Anyways, and that the writ he could do at any time.  The other  ones would have no time limit because of how far my brother was away. . . .

EH 166-167.

During her visits to petitioner, Cheryl reported what Robertson had said about the time limits.  EH 121.  Laura also told petitioner that Robertson was taking care of everything.

1    EH 167.  Petitioner said that Robertson's assurance "didn't sound right" and he thought "it

2    should have been done faster."  EH 123, 125.  He thought there were deadlines, but he did not

3    know what they were.  EH 143.  During this time period, petitioner would ask Laura to retrieve

4    cases for him so she could "show the lawyer and find out if it was good or not."  EH 165.

5            Robertson did file something on petitioner's behalf in May 2003.  EH 116.  Only

6    after that was denied did Robertson tell Cheryl he did not know how to do a federal habeas.

7    EH 141.

8            Laura went to work for Robertson in June 2001 and thereafter typed everything

9    that related to petitioner's case.  EH 154.  She quit working for Robertson around the time he

10   filed petitioner's state writ.  EH 154.  She learned that a lawyer-turned-paralegal working for

11   Robertson had been stealing money from Robertson and that Robertson was not doing work he

12   had promised.  Stuck with fielding calls from clients, Laura quit.  EH 155-156.

13           Around this time, petitioner told Cheryl that Robertson "was supposed to file

14   something within a year," so Laura and Cheryl went to Robertson's office and retrieved the

15   transcripts of petitioner's trial.  EH 108, 111, 158.  It was also around that time that Laura

16   learned that the deadline had passed for the federal habeas petition.  EH 157, 174.  In addition,

17   sometime in 2003, Cheryl asked Robertson for their files.  EH 136, 158-159.  They retrieved the

18   transcripts from Robertson's office sometime in 2003.  EH 118.  Cheryl and Laura then began to

19   attempt to work on petitioner's case by checking things on the "Find Law" website and asking a

20   Professor Weisberg.  EH 139, 159-160.  With petitioner's input, they filed something in San

21   Joaquin County Superior Court.  EH 111.  They also attempted to find a new lawyer, but did not

22   have the money.  EH 114, 118.

23           Petitioner found someone in prison to help him with his case and Cheryl paid that

24   person $2000 in 2005.  EH 138, 143.  Laura sent petitioner the trial transcripts sometime in 2004

25   or 2005.  EH 161-162.

26           When petitioner first went to prison in 2000, he was in general population and

became aware that inmates convicted of child molestation were being assaulted "for their charges." EH 177.  He went into protective custody in 2001 or 2002.  EH 177, 207.  After he had been at Corcoran for about a year, he felt comfortable enough to ask that some of his paperwork be sent to him.  EH 208.

At some point trial counsel Peterson wrote to petitioner about the competency proceedings in Superior Court and cited a case petitioner then asked Laura to retrieve.  EH 180. Petitioner also asked her to find cases cited in the materials from Professor Weisberg.  Id.

Robertson visited petitioner only twice, both times in 2003.  EH 178-179.  During one of the visits, Robertson brought petitioner a declaration for petitioner to sign.  However, as noted above, because Robertson had arrived just before the end of visiting hours, petitioner just signed the declaration without really reading it.  EH 211.  This declaration includes the attestation that it was signed in Stockton when in fact it was signed at Corcoran, and the claim that petitioner had asked counsel not to send any legal documents because of the danger they posed to him in prison.  EH 213.

Petitioner had two telephone calls with Robertson; Robertson assured him there was nothing to worry about because they "were still okay."  EH 183.  Eventually, Robertson told petitioner he needed more money to continue with the case, but petitioner said his family did not have any more money.  EH 188.  Until then, however, petitioner believed Robertson was still working on his case, all the way up until 2005.  Id.

In 2005, petitioner began to work at the library at Corcoran and met inmate Jimmy Smith.  EH 184.  Jimmy instructed petitioner to get his transcripts and said he would help. EH 185.  Jimmy prepared a writ, which was filed in the California Supreme Court.  EH 187. Although petitioner in his testimony suggested the Supreme Court writ was filed after he met Jimmy in 2005, the writ was filed in 2004.  Resp't's Ex. D.  Petitioner testified Jimmy told him about the one-year deadline for federal habeas petitions sometime in November 2005.  EH 194. /////

1    Before that, petitioner said he believed a writ would be timely if it was filed within a reasonable

2    time.  Id.

3           Attorney miscalculation or negligence "is simply not sufficient to warrant

4    equitable tolling, particularly in the postconviction context where prisoners have no

5    constitutional right to counsel."  Lawrence, 549 U.S. at 336-37; Frye v. Hickman, 273 F.3d 1144,

6    1146 (9th Cir. 2001) ("miscalculation of the limitations period . . . and negligence in general do

7    not constitute extraordinary circumstances sufficient to warrant equitable tolling").

8           Many courts of appeals have recognized that an attorney's "egregious conduct"

9    may be grounds for equitable tolling.  In Spitsyn v. Moore, the petitioner's mother retained a

10   lawyer nearly a year before the deadline for filing a federal habeas.  After a period of inactivity,

11   the mother wrote to counsel several times, as did the petitioner himself; counsel did not respond.

12   345 F.3d at 798.  Finally, the mother complained to the Washington State Bar Association and

13   wrote to counsel, terminating the representation and asking that counsel return the file.  Counsel

14   never filed the petition and failed to release petitioner's files and records until three months after

15   Spitsyn asked for them and two months after the AEDPA statute of limitations had run. Id. at

16   799-800.  The Ninth Circuit recognized that "where an attorney's conduct is sufficiently

17   egregious, it may constitute an "extraordinary circumstance" warranting equitable tolling of the

18   AEDPA's statute of limitations."  Id. at 800.  It found that the conduct of Spitsyn's attorney met

19   this standard, because it was "so deficient as to distinguish it from . . . merely negligent

20   performance of counsel. . . ."  Id. at 801.  The court rejected the respondent's arguments that

21   petitioner could have met the deadline by filing the petition on his own, noting that "without the

22   file, which [counsel] still possessed, it seems unrealistic to expect Spitsyn to prepare and file a

23   meaningful petition on his own within the limitations period."  Id.

24           In Spitsyn, the Ninth Circuit relied on Baldayaque v. United States, 338 F.3d 145

25   (2d Cir. 2003).  In that case, within days of his sentencing, the movant asked his wife to hire a

26   lawyer to file what he described as a "2255."  With the assistance of a bilingual minister,

16

movant's Spanish-speaking wife hired an attorney, even though the attorney did not appear to know what a 2255 was.  Id. at 148.  The attorney later told them it was too late to file a motion to vacate the sentence, even though he had almost fourteen months in which to do so.  The attorney never met with movant's wife after he received his fee, but accepted the wife's calls and assured her he was taking care of things and waiting for a court date.  Counsel filed a motion for modification of sentence to allow movant to be deported and when that was denied as untimely, informed movant there was nothing further to be done.  By then, the time for filing a § 2255 motion had passed.

The Second Circuit found that Baldayque was entitled to equitable tolling:

> In spite of being specifically directed by his client's representative to file a "2255," Weinstein failed to file such a petition at all.  By refusing to do what was requested by his client on such a fundamental matter, Weinstein violated a basic duty of an attorney to his client.

Id. at 152.  That, coupled with the facts that the attorney undertook no legal research on movant's behalf and improperly advised his wife that a 2255 would be untimely, established the extraordinary circumstances necessary to justify equitable tolling.  Id.  The court remanded for a determination of whether Baldayque had acted with diligence in light of the circumstances.  Id. at 153.

In United States v. Martin, 408 F.3d 1089 (8th Cir. 2005), movant hired his appellate counsel to file a § 2255 motion raising ineffective assistance of trial counsel.  After several months had passed, movant sent the lawyer documents supporting the claim and a month after that, sent a pro se motion.  He asked counsel to file the motion soon because he had heard there was a one-year deadline.  Id. at 1090.  Counsel told movant not to worry and did not return the documents to him.  Movant's wife made numerous calls to the lawyer and paid him additional money; the lawyer told her the motion would be filed soon and that there was no deadline.  Id.  Thereafter, the lawyer refused to communicate with movant or his wife and let the

/////

17

1   deadline pass without filing a motion to vacate petitioner's sentence.  When the wife finally

2   talked to the lawyer, he assured her the motion had been filed when in fact it had not been.

3           The Eighth Circuit found the misconduct in <u>Martin</u> even more egregious than in

4   <u>Spitsyn</u> or <u>Baldayque</u> because the lawyer had actively misled movant about the deadline and

5   about the status of the case and then refused to return documents even after movant demanded

6   them; it found that Martin was entitled to equitable tolling.  <u>Id</u>. at 1094-95.  <u>See also</u> <u>United</u>

7   <u>States v. Wynn</u>, 292 F.3d 226, 230 (5th Cir. 2002) (movant may be entitled to equitable tolling

8   when lawyer told movant he had filed the § 2255 motion when he had not).

9           In the preceding cases, the attorneys' delay related directly to petitions or motions

10  subject to the AEDPA statute of limitations.  Similar considerations apply, however, when the

11  attorneys' derelictions occurred during the exhaustion proceedings so long as the ultimate goal of

12  both client and lawyer was a federal petition.  Thus, in <u>Downs v. McNeil</u>, 520 F.3d 1311 (11th

13  Cir. 2008), the capital petitioner asked Florida's Capital Collateral Regional Counsel (CCRC) to

14  file an exhaustion petition and to file a federal petition as well, asking that it be held in abeyance.

15  Several months later, the CCRC asked petitioner to review the draft of a state petition and

16  sometime later still told petitioner the state petition had been filed.  When petitioner learned it

17  had not been filed, he wrote to the CCRC demanding an explanation and expressing his concern

18  that his chance at federal consideration of his claims was not being protected; counsel did not

19  respond.  The exhaustion petition was ultimately filed one day before the federal statute of

20  limitations ran.  <u>Id</u>. at 1314-15.  While this petition was pending, petitioner prepared a pro se

21  petition, listing the issues he wanted to raise in federal court.  <u>Id</u>. at 1316.  CCRC counsel

22  returned this latter petition to petitioner after the state petition was denied, yet did not file the

23  federal habeas petition until several days after the statute of limitations had run.  The Eleventh

24  Circuit found that if the facts as alleged were true, petitioner would be entitled to equitable

25  tolling, for counsels' misbehavior "ran the gamut from acts of mere negligence to acts of gross

26  negligence to acts of outright willful deceit," which, "viewed as a whole" constituted

1  extraordinary circumstances. Id. at 1323. But see Holland v. Florida, 539 F.3d 1334, 1339 (11th

2  Cir. 2008) (no equitable tolling when counsel failed to communicate but did not actively mislead

3  petitioner about state exhaustion petition, even though petitioner had repeatedly expressed

4  concern about impact of the state petition on his ability to proceed to federal court).

5        The Ninth Circuit has recently considered the interplay between a lawyer's

6  dereliction in a state case and the running of the AEDPA statute of limitations. In Randle v.

7  Crawford, ___ F.3d ___, 2009 WL 2591674 (9th Cir. 2009), state trial counsel filed an untimely

8  notice of appeal from petitioner's conviction and refused to return petitioner's file to him while

9  the Nevada courts considered the appeal. After the Nevada courts declined to entertain the

10  appeal, counsel sent petitioner his file without all the transcripts. Petitioner filed a state habeas

11  petition within six months of receiving his file, relying on counsel's advice that this would be

12  timely under state law. However, this petition was ultimately dismissed as untimely, an order

13  upheld by the Nevada Supreme Court. Petitioner then sought federal habeas relief, arguing that

14  the statute of limitations did not begin to run under § 2244(d)(1)(B) until he received his case

15  file, which constituted the removal of an impediment to his filing. The Ninth Circuit rejected his

16  argument, noting that "Randle sought his legal files in order to file a state habeas petition," not a

17  federal habeas petition, and so could not show a causal relationship between the two events. Id.,

18  2009 WL 2591674 at *10.

19        The Ninth Circuit also rejected Randle's claim that he was entitled to equitable

20  tolling even though counsel's error about the state deadlines had an impact on Randle's timely

21  filing of his federal petition. It similarly rejected Randle's access-to-file claim as a basis for

22  equitable tolling, once again noting that Randle wanted the papers to file a state habeas petition.

23  The Ninth Circuit thus appears to recognize that a lawyer's dereliction in the state case may not

24  be a basis for equitable tolling in federal court.

25        On the record as developed, given the state of the law, this court cannot find that

26  Tibbs and his family retained Robertson to pursue federal habeas relief or that they even asked

1  him about the impact of any state petition on petitioner's ability to proceed to federal court.

2  Petitioner has not produced any contemporary written records showing the scope of Robertson's

3  undertaking on petitioner's behalf: the only retainer agreements and billing records relate to the

4  motion for a new trial and the direct appeal.  Additionally, although Cheryl's and Laura's

5  declarations state that the contract with Robertson included a federal petition, they did not so

6  testify in the absence of leading questions.  When asked an open-ended question, Cheryl did not

7  mention federal habeas:

8          Q: What was your understanding of Mr. Robertson's

9          responsibilities on your husband's case?

10         A: Doing the appeal.

11         Q: Anything else?

12         A.  The writ, if it – it he had to do a writ of habeas corpus , is that

13         what it's called, a writ of –

14         Q: Okay.

15         A.  –then he would do that also.

16  EH 104; <u>cf</u>. EH 140 ("Did you believe he . . . was going to be doing the writ of habeas corpus in

17  federal court?").

18         More telling is Laura's response when she was asked if the retainer agreement

19  included "the state habeas corpus and federal habeas corpus."

20         It was a habeas corpus that was supposed to be filed
           simultaneously with the appeal is what he said he was going to do.
21         But I wasn't aware at the time yet of all that at the time.

22  EH 150.  Laura also admitted that when they retained Robertson they "didn't know there was

23  difference of appeals or anything at the time."  EH 148.  Moreover, although both Cheryl and

24  Laura testified they asked Robertson about time limits, they did not testify that they specifically

25  asked Robertson about deadlines in federal court.  <u>See</u>, <u>e</u>.<u>g</u>., EH 105-106, 153.

26  /////

1        On this record, the court finds that the Tibbs family retained Robertson to pursue

2   the state appeal and state habeas, but not federal habeas, something about which they were

3   unaware.  From this determination flows the conclusion that however negligent Robertson was in

4   pursuing the state writs, and however misleading his advice was about time limits, it is not a

5   basis for equitable tolling in this court.  Petitioner has not established that he or his

6   representatives asked about the time limit for federal habeas petitions specifically or that

7   Robertson's advice otherwise encompassed more than the state collateral attacks.

8        As noted above, in those cases recognizing that an attorney's deception and other

9   egregious misconduct can be the basis of equitable tolling, the lawyer was retained to prepare the

10  petition subject to the deadline or the clients made counsel aware that federal habeas was the

11  ultimate goal.  In both these situations, tolling was justified when counsel acted in a way harmful

12  to what counsel knew to be the client's interest.

13       Although Robertson's action and inaction ultimately had an impact on the instant

14  litigation, in the absence of a finding that he was retained to protect petitioner's federal rights, the

15  court does not find that his actions amounted to misconduct sufficient for a finding of equitable

16  tolling.  Because "courts must be sparing in the use of this doctrine," it would be unwarranted to

17  conclude that an attorney's actions justify equitable tolling unless the attorney was retained to

18  protect the federal rights or was at least aware that his state-court representation was only a

19  prelude to federal relief.  LaCava v. Kyler, 398 F.3d 271, 275 (3d Cir. 2005); see also Spitsyn,

20  345 F.3d at 799 (high threshold to trigger equitable tolling).

21       The court acknowledges that in Fleming v. Evans, 481 F.3d 1249 (10th Cir.

22  2007), the Court of Appeals remanded the case for further proceedings after finding that retained

23  counsel's failure to file a timely state post-conviction petition despite his assurance that it was

24  forthcoming might be sufficient for equitable tolling.  Id. at 1256-57.  The court in Fleming does

25  not discuss whether this lawyer was retained to protect the petitioner's federal rights as well as

26  his state rights; rather, it suggests that petitioner gave some notice to counsel of his concern about

the federal statute of limitations, for it noted that petitioner prepared his own petition "aware that the one-year limitations period was fast approaching . . . ." Id. at 1256. Fleming does not hold that a lawyer's malfeasance is sufficient for tolling to adhere, even though he was unaware of his client's concern with federal habeas relief; to extend Fleming in this way would expand the doctrine of equitable tolling beyond its limited application.

The result does not change, even if the court finds that when Robertson was retained to take the case "all the way," he was under contract to pursue federal habeas, or even if it concludes that attorney malfeasance at the state court level supports a finding of equitable tolling without more. A finding of egregious misconduct by itself will not warrant equitable tolling: the petitioner must also have exercised "reasonable diligence in pursuing the matter, under the circumstances he faced. . . ." Spitsyn, 345 F.3d at 802.

> "Due diligence . . . does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts. Moreover, the due diligence inquiry is an individualized one that must take into account the conditions of confinement and the reality of the prison system.

Downs, 520 F.3d at 1323 (internal citation, quotation omitted).

First, the court does not credit petitioner's testimony that he believed Robertson was representing him until sometime in 2005 or that he did not learn of the one-year statute of limitations until November 2005. See EH 188, 194. Cheryl testified that petitioner rejected Robertson's assurance that she conveyed in 2002 or 2003, because he thought there were deadlines. EH 121, 123, 125. And Laura testified that around the time she quit Robertson's employ, sometime in 2003, petitioner told her he had learned of the one-year statute of limitations for federal petitions. EH 108, 111, 118, 158. In addition, sometime before 2005, petitioner must have solicited Jimmy Smith's help, as shown by the petition Jimmy filed on petitioner's behalf in the California Supreme Court in May 2004. EH 187; Resp't's Ex. D. Finally, Laura and Cheryl filed something on petitioner's behalf in San Joaquin County Superior

/////

1  Court in 2003.  EH 111.  The court finds that petitioner was aware of the statute of limitations

2  and the fact that Robertson was not protecting his interests by 2003.

3        The fact that an inmate convicted of child molestation may be in danger in prison

4  should not be downplayed and so the court accepts petitioner's reason for not wanting his

5  transcripts and other legal paperwork before he was moved to protective custody.  However,

6  petitioner was placed in the sensitive needs program where he felt more comfortable in April

7  2002, and his family retrieved the files and transcripts from Robertson sometime in 2003; yet

8  petitioner did not ask that the materials be sent to him until 2004.  Surreply (Docket No. 13),

9  Decl. of Neal Tibbs; EH 162, 208.

10        Finally, after the Supreme Court denied petitioner's exhaustion habeas petition on

11  July 13, 2005, petitioner waited until October 30, 2005, a period of 108 days, to file the petition

12  now pending in this court.[10]  Petitioner testified when the institution was on lock-down, as it was

13  for a time, it was difficult for petitioner to communicate with Jimmy, who lived in a different

14  building.  EH 197.   This does not demonstrate diligence or otherwise justify equitable tolling,

15  particularly in light of the fact that the instant petition relies largely on the briefing done by

16  Attorney Robertson as support for its claims.  United States v. Cicero, 214 F.3d 199, 204 (D.C.

17  Cir. 2000) (no equitable tolling when inmate gave his papers to writ writer, who was then placed

18  in segregation); Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000) (reliance on writ writer

19  not sufficient).

20  IV.  Other Matters

21        The court directed Dr. Geiger to show cause why she delayed in turning over her

22  raw data to respondent's counsel.  See Order (Docket No. 61).  Dr. Geiger has responded that the

23  order was misdirected and she was unsure where to send the materials.  The court accepts the

24  explanation and discharges the order to show cause.

25

26     [10]  The court relies on the date petitioner signed the action.  Houston v. Lack, 487 U.S.
266, 276 (1988) (prison mail box rule).

1    Petitioner has asked that the materials relied upon by Dr. Geiger and submitted to

2  the court by respondent be sealed.  This request is well taken.

3    IT IS THEREFORE ORDERED that:

4    1.  The order to show cause (docket no. 61) is discharged; and

5    2.  Petitioner's request to seal materials (docket no. 67) is granted.  The clerk of

6  the court is directed to seal the materials filed as an exhibit to the two-page letter filed at docket

7  no. 66, without sealing the letter itself.

8    Accordingly, IT IS HEREBY RECOMMENDED that respondent's motion to

9  dismiss (docket no. 8) be granted and the petition be dismissed as untimely.

10    These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12  days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15  shall be served and filed within ten days after service of the objections.  The parties are advised

16  that failure to file objections within the specified time may waive the right to appeal the District

17  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18  DATED:  September 29, 2009.

19

20

21    U.S. MAGISTRATE JUDGE

22

23

24

25  2

26  tibb2334.157